JAMES KNAGGS, APPELLEE, V. CITY OF LEXINGTON, NEBRASKA, A MUNICIPAL CORPORATION, APPELLANT.
105 N. W. 2d 727

Filed November 4, 1960. No. 34859.

*Stewart & Stewart,* for appellant.

*Smith Brothers,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Dawson County. It involves a claim arising under the Nebraska Workmen's Compensation Act which was originally filed by James Knaggs in the Nebraska Workmen's Com-

pensation Court. The district court, on appeal by the City of Lexington, found that James Knaggs, claimant, was totally and permanently disabled by reason of a heart attack caused by an accident arising out of and in the course of his employment with the City of Lexington and, because thereof, ordered the city to pay claimant the sum of $33.84 per week for 300 weeks and thereafter the sum of $22.84 per week for the remainder of his life. It also ordered the city to pay certain medical, hospital, drug, and nursing bills, together with other expenses had by claimant in connection with his condition following the accident, all of which amounted to the sum of $1,967.02.

The City of Lexington filed a motion for new trial. This motion the trial court overruled except as to the items of hospital and medical expenses. As to these it granted a new trial for the purpose of redetermining the amount thereof. From this order the city took an appeal to this court. On appeal to this court in a workmen's compensation case the cause is considered de novo upon the record before us. Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51; Gotfrey v. Sakurada, 169 Neb. 879, 101 N. W. 2d 470. However, "* * * where the evidence is conflicting and cannot be reconciled, this court will consider the fact that the district court that tried the cause de novo and observed the demeanor of witnesses gave credence to the testimony of some rather than to the contradictory testimony of others." Dietz v. State, 157 Neb. 324, 59 N. W. 2d 587.

Appellant states the question involved in this appeal as: "Did the appellee suffer an injury to his person which was the proximate result of an accident within the meaning of the Nebraska Workmen's Compensation Act?" In this respect appellee has the burden of proof. See, Anderson v. Cowger, *supra;* Chiles v. Cudahy Packing Co., 158 Neb. 713, 64 N. W. 2d 459; Jones v. Yankee Hill Brick Manuf. Co., 161 Neb. 404, 73 N. W. 2d 394. He must prove, in order to recover, "* * * that an acci-

dent occurred arising out of and in the course of employment which accident produced injury that resulted in disability or death." Anderson v. Cowger, *supra.* See, also, Jones v. Yankee Hill Brick Manuf. Co., *supra;* Gotfrey v. Sakurada, *supra.* And, as we have often said in this respect, a compensation award cannot be based on possibilities or probabilities. See, Pixa v. Grainger Bros. Co., 143 Neb. 922, 12 N. W. 2d 74; Chiles v. Cudahy Packing Co., *supra;* Anderson v. Cowger, *supra;* Gotfrey v. Sakurada, *supra.*

There must be a causal connection between an accident suffered by the claimant and the cause of his disability. Anderson v. Cowger, *supra;* Pixa v. Grainger Bros. Co., *supra;* McCauley v. Harris, 164 Neb. 216, 82 N. W. 2d 30. In Schirmer v. Cedar County Farmers Telephone Co., 139 Neb. 182, 296 N. W. 875, we discussed the latter, as it relates to the situation here presented, in the following language: " 'In the determination of the question of causation, the disability or death for which compensation is claimed may just as legitimately be attributed to the accidental injury where undeveloped and latent physical conditions are set in motion and accelerated so as to produce such final result as where the same result follows directly from visible violence done to the physical structure of the body.' 71 C. J. 605. 'The acceleration, aggravation, or lighting up of a preexisting disease by an injury may constitute disability of a character such as to come within the meaning of workmen's compensation acts.' 71 C. J. 608. 'Where an employee, while engaged in the work of his employment, aggravates or accelerates the condition of diseased blood vessels, thereby causing death or disability, it may constitute an injury of a character such as to come within the meaning of workmen's compensation acts.' 71 C. J. 610. 'The acceleration or aggravation of an employee's heart condition thereby causing death or other disability may constitute physical harm of such a character as to come within the mean-

ing of workmen's compensation acts.' 71 C. J. 611." "An accident, within the meaning of the statute, shall be construed to mean an unexpected or unforeseen event happening suddenly and violently with or without human fault and producing at the time objective symptoms of injury. § 48-151, R. R. S. 1943; Ruderman v. Foreman Bros., *supra* (157 Neb. 605, 60 N. W. 2d 658); Muff v. Brainard, 150 Neb. 650, 35 N. W. 2d 597. Symptoms of pain and anguish, such as weakness, pallor, sickness, nausea, expressions of pain clearly involuntary, or any other symptoms indicating a deleterious change in the bodily condition may constitute objective symptoms as required by our statute. Beam v. Goodyear Tire & Rubber Co., *supra* (152 Neb. 663, 42 N. W. 2d 293); Manning v. Pomerene, 101 Neb. 127, 162 N. W. 492." Anderson v. Cowger, *supra*. See, also, Pittenger v. Safeway Stores, Inc., 166 Neb. 858, 91 N. W. 2d 31; Jones v. Yankee Hill Brick Manuf. Co., *supra;* Tucker v. Paxton & Gallagher Co., 153 Neb. 1, 43 N. W. 2d 522.

"Mere exertion that would not by itself produce compensable disability, and which is not greater in extent than that ordinarily incident to an employment, but which combines with a preexisting disease to produce a disability, is not an injury caused by accident that becomes such a part of the proximate cause of such disability as to be compensable under the provisions of the workmen's compensation act." Gilkeson v. Northern Gas Engineering Co., 127 Neb. 124, 254 N. W. 714. See, also, Rose v. City of Fairmont, 140 Neb. 550, 300 N. W. 574; Brown v. City of Omaha, 141 Neb. 587, 4 N. W. 2d 564; Anderson v. Cowger, *supra;* Jones v. Yankee Hill Brick Manuf. Co. *supra;* Feagins v. Carver, 162 Neb. 116, 75 N. W. 2d 379; Eschenbrenner v. Employers Mutual Casualty Co., 165 Neb. 32, 84 N. W. 2d 169.

"In considering the sufficiency of the proof it should be remembered the rule of liberal construction, as it relates to the workmen's compensation law, applies to the law and not to the evidence offered to support a claim

by virtue of the law. The rule does not dispense with the necessity that claimant prove his right to compensation; that is, it does not permit a court to award compensation when the required proof is lacking." Anderson v. Cowger, *supra*. See, also, Gotfrey v. Sakurada, *supra;* Chiles v. Cudahy Packing Co., *supra;* Hamilton v. Heubner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1.

"For workmen's compensation purposes 'total disability' does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or a work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do." Anderson v. Cowger, *supra*.

In the light of these principles we set forth the facts adduced. There is little dispute in the evidence except that of the doctors as their testimony relates to the cause of appellee's acute coronary occlusion, which condition resulted in his being totally and permanently disabled insofar as his ability to perform hard manual labor is concerned.

Appellee was employed by appellant in 1951 to work in its community hospital, known as Lexington Community Hospital, as a general custodial and utility employee. His duties consisted of maintaining the entire hospital property, both inside and outside. His work included the care of the oxygen equipment in the hospital, which required him to move oxygen tanks weighing from 300 to 400 pounds; the lifting of patients in and out of bed; the taking of supplies to every floor of the hospital; the care of the boiler room; the painting and carpenter work; the scooping of snow; the mowing of the lawn; the trimming of trees; and the doing of everything that would come up in the hospital involving hard or heavy manual labor. He worked at his job 6 days a week, sometimes on Sundays, and occasionally at night.

On Saturday, February 1, 1958, appellee went to work at 8 a.m. He was then about 49½ to 50 years of

age, 5 feet 8 inches in height, weighed about 170 pounds and in apparent good health. He testified he was feeling real good when he went to work. He performed the usual routine duties of his job that morning when, about 10:30 while he was in the dining room on a coffee break, he was called by Mrs. Olmsted, a cook in the hospital, to fix a clogged disposal unit. Fixing a clogged disposal unit was one of the duties of his job as this condition apparently occurred quite frequently. Appellee got a large plunger for the purpose of fixing the clogged disposal unit. He then stepped on a chair and up onto the apron of the sink in which the disposal unit was located. Appellee placed his feet on the metal edge of the sink and began using the plunger while another employee of the hospital sought to flush it with water by means of an automatic flusher. After plunging it a few times appellee's feet slipped out from under him when, as he pushed the plunger down, it threw him and he fell backwards. When he fell either the lower part of his back or his buttocks hit the metal portion of the edge of the sink very hard. After falling appellee sat on the edge of the sink a short time, putting his feet on the chair which he had used to get up onto the sink. He testified the fall resulted in his having a peculiar, shook-up, trembling feeling; and that he didn't feel right. After sitting for a short time appellee got back up on the sink and finished the job, advising Mrs. Olmsted of that fact after he had done so. The job of fixing the clogged disposal unit took some 5 or 6 minutes.

Appellee then went into the laundry room, which is next to the room in which the disposal unit was located, to paint a strip of floor some 4 feet wide along the east side thereof. Located in this area, and against the east wall were two electrical units, one a refrigerator and the other a deep freeze. Appellee had previously moved the refrigerator, which weighed some 500 pounds, but had never had occasion to move the deep freeze which

had been installed in the laundry room some 2 or 3 months before the accident. The deep freeze was about 12 to 15 feet long, 3 to 4 feet deep, and 3½ to 4 feet high. It weighed about 1,500 pounds and, when placed in the laundry room, it was placed there by 3 men who used rollers for the purpose of moving it into the laundry room of the hospital from a truck that brought it to the hospital. Appellee had to move these two pieces out from the east wall of the laundry room some 4 feet in order to paint the floor along the east wall thereof. He had, the day before, moved the deep freeze out from the wall with a claw bar far enough so he could get behind it.

After appellee put away the plunger, the laundry room being used by him as his workshop, he proceeded to move the deep freeze, which was full of groceries. He did so by pushing it with his feet, getting behind it with his back to the wall. He pushed it out by pushing it first at one end and then at the other until finally he got it out from the wall the desired distance of about 4 feet. Appellee testified it took every bit of effort he could give to move the deep freeze and that he pushed it as hard as he could. Appellee then moved the refrigerator, which was full of groceries, out far enough to paint a 4-foot strip. He did so by pushing and pulling it. Moving the deep freeze and refrigerator took about 20 to 25 minutes. During all of the time appellee was doing this work he continued to have this peculiar, shook-up, trembling feeling that came over him after the fall he had taken while fixing the clogged disposal unit.

After he moved out the two pieces of equipment appellee got a pan of paint and a roller and started to paint a 4-foot strip along the east side of the laundry room. As he started using the roller for this purpose the pain he had got worse. He hurried with the painting to get through but the pain kept increasing. Finally, after 20 to 25 minutes, he finished the painting job but

he was not able to put away the tools he was using. He just put them to one side. When he finished the painting, pain was all over his body and he had a trembling feeling. He walked down to the laboratory in the hospital, which was on the same floor but some 200 feet from the laundry room. The pain kept getting worse and he couldn't sit down. A doctor was called. The doctor put him in a wheel chair and took him to a room where he was given a shot.

Appellee described his condition, before he was given the shot, as though he was going to pieces from the pain which was all over his body. Witnesses, who saw him in the wheel chair, testified appellee looked pale and appeared in extreme and acute pain; and that he had his hands clenched and was moaning and groaning. Appellee was kept in the hospital because of this condition until March 30, 1958, and there is no question but that, in view of our holding as hereinbefore set forth, he is now totally and permanently disabled because thereof. Appellee was only trained for and had always engaged in the performance of hard and heavy manual labor as a means of earning a livelihood. The evidence adduced shows, because of his present physical condition due to the coronary occlusion he suffered, that he can no longer engage in the performance thereof.

Appellee testified he had no knowledge of ever having experienced a heart attack prior to February 1, 1958, nor had he ever suffered any arm or chest pains. Dr. E. A. Watson of Lexington, who testified appellee was a patient of his, said he never observed appellee having any symptoms of heart disease nor had he ever made any complaints to him which could relate thereto, such as pain in the arms, shoulders, chest, or being short of breath.

Dr. E. A. Watson attended appellee during the course of his illness resulting from the acute coronary infarct or occlusion he suffered on February 1, 1958. He testified on direct examination that: "I think that the

trauma associated with the fall, the temporary shock pattern which developed following the fall, the extreme exertion or moving the heavy equipment shortly thereafter at the hospital, all played a very prominent picture in causing the picture of coronary thrombosis or coronary infarct to develop at that time." He was then asked on cross-examination: "Now Doctor, I think your testimony has been that you believe his heart attack came on as a result of the combination of this trauma to his buttocks and the extreme exertion on moving the equipment - - is that your conclusion?" To this question he responded: "It is." He was further asked on cross-examination: "And so when you say that in your opinion, the combination of the falling on the buttocks and the extreme exertion, that's your opinion, that's your guess at it, isn't it, Doctor? You can't say definitely, unless there was an operation or unless you could examine the organs?" To this he responded: "If the combination, as you have described it, hadn't happened, Mr. Knaggs wouldn't have had a coronary on the 1st of February, 1958." He then was asked on redirect: "And as I understand your testimony, why, you are of the opinion that this man's heart attack arose from a combination of the physical and emotional shock and the fall and the heavy exertion, is that correct?" To this he responded: "That's correct."

Dr. Arthur M. Greene of Omaha, who specializes in internal medicine, examined appellee at his office in Omaha on August 4, 1959. He took a complete history of the appellee at that time, made a physical examination, took an electrocardiogram and chest X-rays, and did certain laboratory work. The laboratory work consisted of determining the sedimentation rate, infarction volume, hemoglobin, white blood count, differential blood count, and urinalysis. From these he found evidence of heart disease but no evidence of infections or other diseases leading to heart disease, that is, his

examination revealed an acute, severe antero-septal myocardial infarction. Dr. Greene stated: "The cause of the hardening of the arteries is arteriosclerosis; the heart attack occurs when the vessel is suddenly blocked, either by hemorrhage into an arteriosclerotic plaque or by a sudden blood clot into in (an) artery or by rupture of an artery in the coronary system of the heart." Dr. Greene discussed the causes leading up to appellee's condition and thereafter went on to state that: "My opinion is that this gentleman, although previously having had coronary sclerosis, suffered an acute heart attack because of unusual stress and strain of the morning's activities." On cross-examination he was asked: "Doctor, you talked about the unusual stress and strain from his morning's activities. Which particular activties were you thinking of?" To this question he responded: "I was thinking mainly of a sudden fall and a jolt, landing on his buttocks, and then using all of his strength to move a heavy refrigerator (deep freeze)."

It is true that three other well-qualified doctors were of the opposite opinion. In this situation we consider as applicable the rule hereinbefore stated when evidence is conflicting and cannot be reconciled. In this respect we mention the circumstance of appellee moving the fully-loaded deep freeze as not being exertion of a character as would ordinarily be incident to his employment. The evidence shows it required extreme overexertion. We have come to the conclusion, as did the district court, that appellee suffered a compensable injury due to an accident arising out of and in the course of his employment. Admittedly appellee was, on February 1, 1958, drawing wages of $50.77 per week and there is no question raised about the weekly payments allowed appellee being correct in view thereof.

Appellant and appellee have both cited Nebraska cases contending they exemplify factual situations comparable to the one before us and that the holdings therein should, in effect, be controlling here. Each case arising

under the Nebraska Workmen's Compensation Act must stand on its own facts and the laws of this state relating thereto, together with our opinions construing such laws. And, as to the cases cited from other jurisdictions, we said in Eschenbrenner v. Employers Mutual Casualty Co., *supra:* "In referring to the decisions of other jurisdictions it must be borne in mind that the compensation laws of the various states differ widely in many essential respects." And, we might add, the opinions of various states also differ widely in construing identical provisions.

The trial court, as hereinbefore stated, granted appellant a new trial for determining the proper amount to be allowed for medical and hospital expenses incurred because of the injury suffered by appellee. It appears that although appellee was hospitalized from February 1 to March 30, 1958, because of the acute coronary occlusion which he suffered on February 1, 1958, he was also treated for duodenal ulcers and probably gall bladder condition while confined therein. In fact, appellee consented to remit $60 from the amount allowed for medical and hospital services, together with half of the total of $54 allowed as expenses for two trips to Omaha, because they related to his being treated for these diseases. The record fully supports the trial court's order in this respect and is affirmed. Costs of this appeal are taxed to appellant.

In view of what we have said the judgment of the trial court is in all respects affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.

CARTER, J., dissenting.

I cannot agree that causal connection between the accident and the coronary occlusion was established. Three physicians called by the defendant testified to a complete absence of causal connection. They testified that a coronary occlusion is a result of arterial disease of long duration. At a certain stage of its progress a coronary

occlusion is inevitable and is unaffected by trauma unless the injury is directly in the area of the diseased portion of the anatomy. The decision in this case, however, rests on the evidence of two doctors called by the plaintiff.

Dr. Arthur M. Greene testified that a coronary occlusion could result from an injury to the area of the heart or from extreme exertion. It was his opinion that the plaintiff in falling on his buttocks and the exertion of pushing the deep freeze provided a pattern that precipitated the coronary attack. He knew of no instance where such a fall precipitated a coronary attack. He could not say when the heart attack occurred nor could he point to any event of the morning that caused plaintiff's attack. He stated that it was conceivable that a coronary attack might result from the jar of the fall but that he did not know if it could. On this point he admitted that he was in the realm of possibility only.

Dr. E. A. Watson testified that he could not say that any one thing caused the coronary attack and that it was the exertion resulting from everything that happened that induced the attack. He stated that the only sure way of determining the cause of a coronary attack was by autopsy after death. In discussing the relation of overexertion to the coronary attack he said that it was theorizing on his part but that he felt that the whole sequence of events was a pattern and if the pattern hadn't occurred, plaintiff would not have suffered a coronary attack on the day he did. He testified that he could point to no single event that induced the coronary attack.

There is no evidence in this record that the fall on the buttocks alone produced, activated, or accelerated the coronary attack. There is evidence in the record that it did not and could not have produced, activated, or accelerated the attack. In my opinion the evidence is clearly insufficient to establish by a preponderance of the evidence that the fall caused, activated, or accel-

erated the coronary attack. I submit that it takes more than proximity in time to establish causal connection between an accident such as we have here and a coronary attack.

This court on several occasions has held that the burden of establishing that an accident contributed directly to the death of an employee or to the activation or acceleration of a disease is not met by mere guess, surmise, conjecture, speculation, or possibility. Nelson v. Frenchman-Cambridge Irr. Dist., 168 Neb. 37, 95 N. W. 2d 201; Ruderman v. Forman Bros., 157 Neb. 605, 60 N. W. 2d 658; Pixa v. Grainger Bros. Co., 143 Neb. 922, 12 N. W. 2d 74; Rose v. City of Fairmont, 140 Neb. 550, 300 N. W. 574.